UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **DUSTIN MICHAEL SLAUGHTER**, <br><br> *Plaintiff,* <br><br> v. <br><br> **DEPARTMENT OF THE AIR FORCE**, <br><br> *Defendant.* | Case No. 1:24-cv-862-RCL |

**MEMORANDUM OPINION**

This Freedom of Information Act ("FOIA") case is before the Court on the Department of the Air Force's Motion for Summary Judgment, ECF No. 19, and Plaintiff Dustin Slaughter's Cross-Motion for Summary Judgment, ECF No. 21. The parties debate the adequacy of the Air Force's searches and its withholding of one video that is responsive to Slaughter's FOIA request. Regarding the adequacy of the searches, the Court concludes that the Air Force's briefs and accompanying declarations are insufficient for the Court to resolve either party's motion on the merits. The Court will therefore order the Air Force to supplement its declarations as described below. As for the Air Force's decision to withhold one responsive record in full, the Court will grant the government summary judgment.

        I.  **BACKGROUND**

Plaintiff Dustin Michael Slaughter is an independent journalist and publisher of *The UAP Register*, which seeks "to contribute accurately sourced reporting" on the mystery of unidentified aerial phenomena and unidentified flying objects. Declaration of Dustin Slaughter ("Slaughter Decl.") ¶¶ 1–5, ECF No. 21-1. Slaughter submitted a FOIA request to the Air Force's National

1

Air and Space Intelligence Center ("NASIC") seeking all "videos submitted by U.S. Air Force personnel to [NASIC] pertaining to unidentified aerial phenomena, unidentified aerospace phenomena, unidentified flying objects, and unidentified unmanned aerial systems and vehicles . . . from March 1, 2022, to April 11, 2023." Slaughter 12/13/2023 Ltr., ECF No. 1-18 (alteration in original).[1]

On November 14, 2023, the Air Force issued a final determination stating that no records were found in response to Slaughter's request. Slaughter Decl. ¶ 15, ECF No. 21-1; NASIC 14/11/2023 Ltr., ECF No. 1-17. About a month later, Slaughter filed a timely administrative appeal challenging the adequacy of the first search. Slaughter Decl. ¶ 16, ECF No. 21-1; Slaughter 12/13/2023 Ltr, ECF No. 1-18. On January 31, 2024, the Air Force informed Slaughter that it "estimate[d]" a response to his appeal within "30 working days." Slaughter Decl. ¶ 17, ECF No. 21-1; NASIC 31/1/2024 Ltr., ECF No. 1-20. When the estimated deadline passed without any update from the Air Force, Slaughter filed his complaint in the present action on March 26, 2024. Slaughter Decl. ¶¶ 18–19, ECF No. 21-1; Compl., ECF No. 1. About two months later, the Air Force changed its position and initiated a second round of searches. First Declaration of Rafael Soriano ("Soriano 1st Decl.") ¶ 8, ECF No. 19-3. This second round produced three responsive records.

1. **The F-22 Video**

The NASIC FOIA team began by tasking all NASIC units via an internal tasking system to search for: "all videos submitted by Air Force personnel to NASIC pertaining to unidentified aerial phenomena, unidentified aerospace phenomena, unidentified flying objects, and unidentified

---

[1] Slaughter's initial request sought "[a]ll documentation" submitted by U.S. Air Force personnel to NASIC relating to unidentified aerial phenomena or the like, but he later narrowed the scope of his request to "videos only." NASIC 14/11/2023 Ltr., ECF No. 1-17.

unmanned aerial systems and vehicles from 1 March 2022 through 14 November 2023." *Id.* Through a declaration submitted by the interim FOIA Manager for NASIC, Staff Sargent Rafael Soriano, the Air Force asserts that "[e]ach NASIC unit did its search in a manner likely to produce responsive videos." *Id.* ¶¶ 1, 8. Common search terms used by these units included: "unidentified aerial phenomena," "unidentified aerospace phenomena," "unidentified flying object," "unidentified unmanned aerial systems and vehicles," "unidentified," and "aerial." *Id.*

From these searches, two classified videos were identified and sent to the FOIA team. One video was deemed non-responsive because it was not "submitted by U.S. Air Force personnel." *Id.* The second video, which was deemed responsive, was located by the leader of the Electronics Analysis Squadron ("the UAP team")—a group that, from June 2021 until April 2023, operated as NASIC's central point for coordinating all unidentified aerial phenomena matters. *Id.* ¶ 9. The team's leader conducted his search by filtering his archived emails for those with video attachments and examined each individually to identify responsive records. *Id.*

As mentioned, he located one responsive video through this search. NASIC submitted that video for a classification review, which determined that the video is properly classified at the "confidential" level. Declaration of Matthew Osterhage ("Osterhage Decl.") ¶¶ 4, 7, ECF No. 19-4. The video was review by Colonel Matthew Osterhage, the Director of Air Force Special Programs at the Office of the Assistant Secretary of the Air Force for Acquisition, Technology, and Logistics, who holds original classification authority at the "top-secret" level and is authorized to make relevant original classification and declassification decisions. *Id.* ¶¶ 1–2.

Osterhage concluded that the video was properly classified. In his declaration, Osterhage explained that the video "displays pilot cues for the Launch Acceptability Region . . . for the AIM-9X missile as integrated onto the F-22" stealth aircraft. *Id.* ¶ 7. The Launch Acceptability Region

"defines the kinematic envelope in which the F-22 can take an effective AIM-9X shot against an airborne target." *Id*. Osterhage determined that disclosure of the video could "allow an adversary to develop effective tactics to negate the advantages of the F-22 in an air-to-air combat scenario." *Id*. ¶ 9. He further concluded that, based on his review of the video, "there is no additional meaningful, non-exempt information that may be reasonably segregated and released without disclosing information that is properly classified." *Id.* ¶ 11. As a result, the Air Force withheld this video in full. Soriano 1st Decl. ¶ 11, ECF No. 19-3.

### 2. The DVIDS and SOCOM Videos

After the leader of the UAP team identified a responsive record, NASIC thereafter identified the names of the other members of that team and individually contacted them to check whether they had any videos responsive to this FOIA request. *Id*. ¶ 12. One member of this team located two responsive videos in "his computer files." *Id*.

The first video, which depicted an object appearing to fly through a plume of superheated gas during an eruption of Italy's Mt. Etna volcano, had already been publicly released on the Defense Visual Information Distribution Service (DVIDS) website. *Id.*; *see also* DVIDS, *Mt. Edna Object* (Nov. 19, 2024), https://www.dvidshub.net/video/944201/mt-etna-object.[2]

The second responsive video depicts "an unidentified metallic-looking spherical object" moving across the sky. Slaughter Decl. ¶ 35, ECF No. 21-1. This video belonged to United States Special Operations Command ("SOCOM"). *See* Soriano 1st Decl. ¶ 13, ECF No. 19-3. After undergoing classification review, it was determined that the video could be declassified and

---

[2] According to the All-Domain Anomaly Resolution Office within the Department of War, "optical effects from the intense atmospheric conditions near the volcano distorted the video, causing the object to appear" as if it was "transit[ing] the plume"; the agency has asserted "with moderate confidence that the footage instead depicts a balloon approximately 170 kilometers from the caldera traveling at wind speed and direction." DVIDS, *Mt. Edna Object* (Nov. 19, 2024), https://www.dvidshub.net/video/944201/mt-etna-object.

4

released if redactions were made to the metadata. *Id*. SOCOM performed these redactions and released the video to Slaughter on June 25, 2025. Slaughter Decl. ¶ 25, ECF No. 21-1. Slaughter uploaded the video to YouTube shortly after receiving it and published a story about it on the UAP Register soon thereafter. Dustin Slaughter, *U.S. Air Force Sphere Video ('Mosul Orb') – The UAP Register*, YOUTUBE, https://www.youtube.com/watch?v=if0enV8VfVw; Dustin Slaughter, *U.S. Air Force Releases New UAP Video Depicting Metallic-Looking Sphere*, THE UAP REGISTER (July 1, 2025) https://uapregister.substack.com/p/us-air-force-releases-new-uap-video.

## II.   LEGAL STANDARDS

Summary judgment is appropriate when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While the moving party has the burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id*.

A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983). "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Resp. & Ethics in Wash. v. Dep't of Lab.*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). "[A]n agency's

justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Media Rsch. Ctr. v. U.S. Dep't of Just.*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)) (alteration in original).

### III. DISCUSSION

At issue is the adequacy of the Air Force's searches and its decision to withhold the F-22 video in full. The Court will take each of these matters in turn.

### A. Adequacy of Search

Slaughter opposes summary judgment partly on the basis that the Air Force has failed to conduct an adequate search for responsive records. "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). "To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009). Courts give agency declarations "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt*, 897 F.2d at 542.

The government has not provided details regarding the scope or methods of the initial search that was conducted before Slaughter filed suit, nor has it attempted to defend the adequacy of that search. Gov. Reply at 8, ECF No. 22-1. Relying on Soriano's declarations, the government instead contends that the supplemental searches conducted after this litigation began fulfilled its FOIA obligations. *See* Soriano 1st Decl., ECF No. 19-3; Supplemental Declaration of Rafael

Soriano ("Soriano 2nd Decl."), ECF No. 22-3.  Slaughter, on the other hand, manifestly disagrees, and the Court finds some merit in several of the deficiencies he raises.

    **1.  Record Systems Searched**

Beginning with the searches conducted by the NASIC units other than the UAP team, Slaughter argues that the Air Force has failed to provide sufficient detail regarding these searches. Soriano's declaration states that "all NASIC units" were tasked to perform a search for responsive video records, each unit conducted its search "in a manner likely to produce responsive videos," and that "[a]ll units reported completion of the search."  Soriano 1st Decl. ¶ 8, ECF No. 19-3. Soriano does not, however, identify the types of record systems that were searched by any NASIC unit other than the UAP team, nor does he offer any detail as to the method of these searches.  Put simply, the Court cannot gauge the adequacy of the search without details regarding the "record systems" the agency searched, "why it selected those systems, and how those systems can be queried."  *Hardway v. CIA*, 384 F. Supp. 3d 67, 78 (D.D.C. 2019).

As for the UAP team, we know that the team's leader (who found the F-22 video) searched his "archived emails" and that the member (who found the DVIDS and SOCOM videos) searched his "computer files."  Soriano 1st Decl. ¶¶ 9, 12, ECF No. 19-3.  Soriano's declaration does not suggest the UAP team's leader searched any record system other than his archived emails, nor does it explain why his archived emails would constitute the record system where responsive records were most likely to exist.  Similarly, the declaration lacks clarity on whether the UAP team member's search of "his computer files" included a search of his own archived emails.  With no explanation of the types of record systems NASIC maintains or the rationale for why one personnel would search "archived emails" and another would search "computer files," the declaration does not provide grounds for the Court to conclude the search was adequate.  *See Hardway*, 384 F.

Supp. 3d at 78.  While it is possible that the Air Force's search was sufficient, as of yet the government has left the Court to speculate as to why that may be so.

**2. Search Terms**

Next is the issue of the search terms used by the NASIC units.  Soriano's declaration states that "common search terms included: 'unidentified aerial phenomena,' 'unidentified aerospace phenomena,' 'unidentified flying object,' 'unidentified unmanned aerial systems and vehicles,' 'unidentified,' and 'aerial.'" Soriano 1st Decl. ¶ 8, ECF No. 19-3.  But this list of commonly used search terms does not include "obvious synonyms and logical variations," such as the abbreviations UAP or UFO.  *Jud. Watch, Inc. v. Dep't of Just.*, 373 F. Supp. 3d 120, 125 (D.D.C. 2019); *see also Summers v. Dep't of Just.*, 934 F. Supp. 458, 461 (D.D.C. 1996) (finding search inadequate because search terms used did not include "two of the most common terms used to describe the requested records").  Certainly, in everyday parlance, the abbreviation "UFO" is at least equally as common as the term "unidentified flying object," and the abbreviation "UAP" appears to be the Air Force's own preferred term—seeing as it is used throughout Soriano's own declarations.  Soriano 1st Decl., ECF No. 19-3; Soriano 2nd Decl., ECF No. 22-3.

What's more, the declaration provides a list of "common search terms," not a list of terms actually used by any given personnel.  The Air Force is responsible for submitting a "reasonably detailed" declaration that sets forth, among other things, "the search terms" used, *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990), and this obligation is not fulfilled when a declaration leaves open the possibility that any particular search may have used as few as *one* of the "common search terms" listed.  At minimum, the agency must provide the specific search terms used by the UAP team since this team was "the most likely NASIC members to have any

responsive videos," and indeed were the only NASIC members to identify responsive videos. Soriano 1st Decl. ¶¶ 8–13, ECF No. 19-3.[3]

### 3. Non-Responsive Video Lead

Recall that after the NASIC FOIA team tasked all NASIC units with conducting searches, a video was identified that was ultimately deemed non-responsive only because it was not submitted by U.S. Air Force personnel. Slaughter argues that the Air Force ignored an obvious lead by failing to follow up with the personnel who found this video.

But yet again the vagueness of the Soriano's declarations prevents the Court from assessing the adequacy of the Air Force's search in this respect. Soriano's declaration does not identify who located the non-responsive video nor what record system it was found in. Without more information on the search that produced this record, it is not yet possible to say whether the Air Force had any obligation to further inquire as to whether the individual who produced it possessed other similar records.[4]

### 4. Timing of UAP Team's Disbandment

Soriano indicates that the UAP team's leader had that role "from June 2021 until April 2023," but "[d]ue to the lack of UAP work to support maintaining this central point of coordination, his role was discontinued" and "the team [was] disbanded" with "no one assum[ing] it afterwards." *Id.* ¶ 9. Slaughter points out that he requested video submitted to NASIC from March 1, 2022, to April 11, 2023, and argues that without clarity on the team leader's departure date, it is unknowable

---

[3] It is unclear whether the UAP team leader used any search terms at all or simply sorted his archived emails for video attachments. Though it may have been reasonable to limit his search to emails with video attachments, it is the government's job to explain why.

[4] Notably, Soriano states, in his second declaration, that "[n]o individual other than" the three members of the UAP team "is likely to have responsive records, and there is no other place where these videos would be likely to be stored." Soriano 2nd Decl. ¶ 7, ECF No. 22-3. But Soriano does not square that position with the fact that an unidentified individual (who has not been identified as a UAP team member) found a video that was sent to NASIC pertaining to unidentified aerial phenomena sometime between March 1, 2022, and April 11, 2023.

whether a search of the UAP team leader's archived emails would likely contain responsive records from the period between April 1 and April 11, 2023.

Because the UAP team was the NASIC unit most likely to possess responsive records, it would help the Air Force's case if it were true that the team leader was still in his role as of April 11, 2023. But assuming the agency can provide, in the next round of briefing, the necessary information described above regarding the searches conducted by the other NASIC units, the Court is not persuaded that the precise timing of the team leader's departure matters much since his team was disbanded after he left—meaning that there was no longer a NASIC unit that was obviously more likely to possess responsive records relative to any other unit. Under these circumstances, a general request that all NASIC units perform searches would reasonably cover the Air Force's bases.

* * *

The Court acknowledges that the process of conducting an adequate search for documents requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise." *Schrecker v. Dep't of Just.*, 349 F.3d 657, 662 (D.C. Cir. 2003) (quoting *Johnson v. Exec. Off. for United States Att'ys,* 310 F.3d 771, 776 (D.C.Cir.2002)). But in a few basic respects, the Air Force's declarations are simply too vague to permit the Court to determine whether the agency conducted an adequate search in this case. At minimum, the Court needs the following information: (1) the record systems searched by the NASIC units, including all those searched by each member of the UAP team; (2) the search terms used by the members of the UAP team; and (3) the identity (e.g., NASIC unit) and search method of the individual who located the non-responsive video. The Court will deny both parties' summary judgment motions without prejudice on these issues and allow the agency to submit another declaration supplying the missing details.

## B. Withholding of the F-22 Video

FOIA requires the release of all records responsive to a properly submitted request unless such records are protected from disclosure by one or more of the Act's nine exemptions. 5 U.S.C. § 552(b). Citing FOIA Exemption 1, the Air Force withheld one of the three responsive videos identified as a part of its search. Recall that the withheld video displays pilot cues from the "Launch Acceptability Region" for the AIM-9X missile that is integrated onto the F-22 stealth aircraft. Osterhage Decl. ¶ 7, ECF No. 19-4. The Air Force withheld the video because disclosing it could "allow an adversary to develop effective tactics to negate the advantages of the F-22 in an air-to-air combat scenario." *Id.* ¶ 9.

Under FOIA Exemption 1, agencies may withhold records "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and that "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Slaughter concedes that the Air Force has provided "a detailed description of how some information contained in the F-22 Video" is properly classified under Executive Order 13,526 and therefore properly excludable under Exemption 1. Slaughter MSJ at 20, ECF No. 21-3. He instead argues that Osterhage's declaration provides no explanation as to why the non-exempt information contained in the F-22 Video could not be reasonably segregated and released. *Id.* Under current precedent, however, the government has satisfied the very light burden of demonstrating that non-exempt information cannot be reasonably segregated.

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "It has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Am. Immigr. Laws.*

11

*Ass'n v. U.S. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66, 80 (D.D.C. 2012) (quoting *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)). But the caselaw also makes clear that the agency is entitled to a presumption of compliance "with the obligation to disclose reasonably segregable material." *Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 310 (D.D.C. 2013) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)). As the D.C. Circuit has held, an agency satisfies FOIA's segregability provision by providing a description of "each document withheld, as well as the exemption under which it was withheld," along with an affidavit in which an agency official attests to "personally conduct[ing] a line-by-line review of each document withheld in full and determin[ing] that no documents contained releaseable information which could be reasonably segregated from the nonreleaseable portions." *Johnson*, 310 F.3d at 776 (internal quotation marks omitted).

Here, Osterhage has provided a description of the video, as well as the reason it has been withheld under Exemption 1, and he has declared that, "[b]ased on [his] review of the video, [he] ha[s] determined that there is no additional meaningful, non-exempt information that may be reasonably segregated and released without disclosing information that is properly classified." Osterhage Decl. ¶ 7. While this Court agrees with Slaughter that the declaration does not provide a description of "what proportion of the information in [the video] is non-exempt and how that material is dispersed throughout" the video, *Mead Data Ctr.*, 566 F.2d at 261, binding D.C. Circuit precedent hold that the Court is to essentially presume that the pilot cues are so prevalent throughout the video such that no intelligible segments of non-exempt information can be reasonably segregated, *see Johnson*, 310 F.3d at 776. The Court will, therefore, grant the government partial summary judgment on this issue.

## IV.   CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** the Air Force's Motion for Summary Judgment and **DENY** Slaughter's Cross-Motion for Summary Judgment. Regarding the adequacy of the searches performed, both parties' motions will be **DENIED WITHOUT PREJUDICE** and the Air Force shall remedy the deficiencies in the explanation of its searches. As for the Air Force's withholding under Exemption 1, the government's motion will be **GRANTED**. A separate order shall issue, scheduling further proceedings.

Date:   3-2-26

Royce C. Lamberth
United States District Judge